We will move to our third case this morning, Thalman v. First Hospital Laboratories. All right, Mr. Edelman. May it please the Court, Counsel. The TCPA junk fax prohibition covers, quote, any material advertising the commercial availability or quality of any property, goods, or services. Close quote. It's in the alternative. Either commercial availability or quality. The defendant claims that its faxes merely request performance of services and therefore don't advertise the commercial availability of anything. It doesn't really address quality at all, and the District Court didn't either. The faxes sent to Dr. Thalman are in the record. They invite a long-term business relationship lasting a year with annual renewals on an independent contractor basis involving the mutual exchange of goods, property, or services. So can you please tell me where are you really landing on what service is being advertised? I mean, there's been a distinction between saying we'd like to do business with you, on the one hand, and actually trying to sell a service, on the other hand. I think that's part of what's going on here. So what service is being sold by First Hospital Laboratories? The principal service is new business. It is offering access to customers that Dr. Thalman So like a contacts lead service or something like that? I'm sorry? Finding new potential patients, even though there's some restrictions in the agreement about that? That is, well, the opportunity to perform services for people and companies that he is not currently performing services for. So a business expansion service? Business expansion, lead generation, all of which have been recognized in mostly District Court decisions as the performance of a service. If the fax had said, we're offering new business, we have leads, we'll give you $5 for each one that you perform services for, I don't think there would be any question that there is an offer of a service. That, however, is difficult to police because a defendant wants to maintain control over its customer base and customer lists. Mr. Ailman, I think we're getting kind of right to the heart of this. I mean, you started with the definition and then Judge Wood's question. So it seems to me that what makes some of these cases difficult is a distinction between a very direct form of advertising, the example you just gave, and indirect. This seems more indirect, if you're correct. How would you articulate the test that we should apply? What's the kind of governing principle? I would recommend the test that Judge Chang adopted in the ALNPO decision, which is very similar facts. It's sent to a prospective intermediary distributor. It's not really clear whether they'd be selling on commission or what, but it lists a number of products and services. We have these. We'd like to enlist you to distribute these. And it's lucrative and it's valuable, and here's a description of what we do. Here you have essentially the same thing. The facts get into detail about the quality of what FS Solutions is providing. It says we have thousands of clients, not just one or two that we need services for. We're a national third-party administrator. We have a wide variety of accounts that we need services for. So, in short, it's going to help your business to be part of our network. That is correct, just like in the ALNPO case, and it is advertising a service. Whenever you have this kind of intermediary, there is a policing problem. They don't want Dr. Thalman to simply have free access to their customer lists. But is there any way that First Hospital could have contacted Dr. Thalman just to see, you know, we're looking for people to perform these occupational health services and tests in your area. We got your name from, you know, somebody reputable, which they did. Would you like to be part of our network? I mean, it seems like that's not an advertisement. That's a request to do business. And so I'm just wondering, where's the line? Where's the line between just saying, would you be one of our providers, and we're actually advertising some broader service to you? I think the line, it's hard to describe, but it's a natural one. The line of cases is saying that the performance of a service or performance of services is not an advertisement, starting with the Lutz case. It's a very bare bones offer of employment. You then have some cases which I think unduly expanded to cases where the nature of the opportunity is described in great detail, when it is clear that there are tangible and intangible products, goods, services being provided. And then I think you have the ALMPO decision, which sets forth a workable test. Does the facts state anything about either the availability or the quality of what it is we have to provide? Now, with a very low-level employment or a survey, there's very little need for that. Show up, answer some questions, get your $100. But when you're seeking to have a long-term distribution relationship, you have to describe in some detail what you're offering. If you send a fax saying, we have two people that we need services for, I mean, it would go directly into the wastebasket. It would not be taken seriously by anybody. So they provide in great detail what kind of business we have, what kind of an opportunity it is. And I think it's sort of a naturally defining answer. So if we were to agree with the Second Circuit's approach, is there any way you could prevail? Yes. The difference between the Third Circuit and the Second Circuit is this. The Third Circuit, in effect disapproving Lutz, says that any advertisement for the acquisition of goods or services is sufficient. That is a legitimate reading of advertisement. The government advertises for things all the time. Second Circuit says – And that's the we buy gold jewelry example? That would be another one. Correct. On the other hand, the Second Circuit says that without more, merely advertising an opportunity isn't sufficient. But here you have the more. You have a business relationship that cannot be intelligently described without going into what the defendant's business is, how extensive it is, how lucrative it is. Just like in ALNPO, in order to make the opportunity make any sense, you have to state what you're distributing, how significant it is to the consumer, things of that nature. The question here is not whether any of these communications in any of these TCPA cases, whether the content of the communication makes sense. The question is whether it fits within the definition of a commercial or unsolicited advertisement, which is any material advertising the commercial availability or quality of any property, goods or services. So it doesn't matter whether this was a meaningful request to enter into a business relationship. If that's what it was, it doesn't fit whether it was meaningful or not. If it was a request to enter into a business relationship as opposed to an advertisement of the commercial availability or quality of property, goods or services, then it doesn't fit within the statute. My point is that in order to draft an advertisement that would make commercial sense, it has to describe both the commercial availability and the quality, and they only have to do one. And this is a services case, if I'm not mistaken. This is not really a product case. There's no goods. They're not selling widgets. They are providing information. They are providing information, which can be certainly, obviously, people buy a lot of information from poll services, as we know. So, I mean, business leads are best, I think, described as a service, but if they're put on a list and made available by computer, there's property as well. And they have extensive confidentiality restrictions, which are justifiable and legal only if what they are providing constitutes property. Right, and it's not a sale of the property, of course, because the property is retained by First Hospital, but it's use of the property. Correct. Sort of leased property, in a sense. Correct. The statute does not require the transfer of title. Making something available for compensation or consideration is entirely sufficient. So, I think they describe in great detail what the quality of the leads, the business generation service is. That is enough to bring it within the TCPA. If somebody, if you don't follow the Third Circuit, and somebody can draft a fax, which doesn't say anything about either the availability or quality of property, goods, or services, they can send it out. But in this particular case, the faxes do describe in detail those things. Mr. Edelman, one of the parts of this that was meaningful to me, I'm going to ask the same question to your adversary, was Exhibit B in the fax. Exhibit B is what they call this fee schedule. Yes. Okay. And if you think of the fax as, or the communication as, yes, it's inviting you into a new business relationship, and as you were discussing with Judge Wood, into a network, if you will, of new potential business opportunities, might that fee schedule not help promote the network? Because, and tell me where I'm wrong here, I thought the point of the fee schedule was to say, hey, if you are willing to provide these various services, and then they're itemized, there's a whole bunch of them, and then there's dollar figures next to them, then you'll be considered a preferred provider. And if you were on the receiving end of that, like Dr. Talman here, wouldn't you look at that fee schedule and say, well, this could be quite lucrative? That's part of the attractiveness, and it's describing the quality of the business opportunity of being in this network. Because if you're going to get $15, for example, for urine collection, you can do it for a whole lot less than that. That's correct. And in addition, the agreement prohibits the recipient, Dr. Talman, from discussing the pricing on that schedule or any other schedule agreed upon with a defendant's customer. So obviously, they're going to mark it up. But yes, this is part of the business generation service that is being provided. Unless Your Honors have some other questions, I'll reserve the remainder of my time. Thank you. Thank you. Ms. Blank. Good morning. My name is Stacey Blank. I'm here today on behalf of the Appley First Hospital Laboratories, which does business as FS Solutions. The district court properly dismissed Mr. Talman's complaint in this case because the facsimiles FS Solutions sent to him are not unsolicited advertisements. As we've noted, the TCPA defines unsolicited advertisement as any material advertising the commercial availability or quality of any property, goods, or services. But the facsimiles here do not do that. They do not advertise the commercial availability or quality of any property, good, or service of FS Solutions. So looking at the facts, though, I mean, aside from this sort of boilerplate disclaimer that it's not a solicitation, which I don't think anybody is bound, you know, it's saying we have thousands of clients. I've attached our provider and service list, add you to our database. It seems that they are, in fact, saying we have a lot to offer you. I mean, this would be a mutually beneficial arrangement, and I'm not sure why it doesn't easily enough fit into the definition of an advertisement for services. So I think there are two reasons for that. And the first is this case is not unlike the offer of employment cases and independent contractor cases where the courts say that offers of employment that are extended are not a good or service. Yeah, no, I have no problem with that. But if you ‑‑ here's the scenario in my mind. Dr. Thalman sees this fax and decides to join the network. So all sorts of people are now coming through his office that were not coming through his office before. So it's a business generation function. And the limitation, as I read the contract that he would have to sign to do this, is he can't circumvent FS solutions. But if he's, you know, if he does a urine analysis on somebody and then, you know, the next month that person shows up because she's pregnant, that's outside the scope of this agreement. But they've learned about him. They've learned that he's a great doctor. You know, business has been generated. And so in the expansion of business frame of mind, I don't know why saying you can be part of our network and it's going to be beneficial to you to do that. But I think this is really no different than the example of a law firm. Right? So if a law firm sends a solicitation to a lawyer that it wants to recruit and says come and join our law firm, even if that fax counts the quality of life in the law firm and the list of services provided and says come, you know, we're going to come to us and even as a contract lawyer, you don't have to become an associate or a partner. We want to retain you as a contract lawyer. And we have lots of clients that need help. And, you know, here's what we'll pay you. And, you know, you have to maintain confidentiality and so forth. I mean the law firm is not in the business of selling offers of employment. But there are companies that are in the business of generating commercial leads for other people. You can go to a law recruitment firm, and they are always interested in expanding their network so that they know, oh, you know, there's some firm in Minneapolis that needs somebody, and there's somebody else in Springfield, Illinois, and there's someone else somewhere else. And as I understand the appellant's argument, this is the business generation kind of thing. We can help you with leads for your business. And that's a service that happens on the market. It is, and I think that may be where the line should be drawn, but that's not what FS Solution sells. It is not a lead generating business. It contracts with medical service providers. It contracts with labs. It contracts with suppliers of all of the component parts of drug testing services. It packages those, and it sells those to its customers. So it's not buying or paying for lead generations. It's not offering Dr. Thalman lead generations in exchange. He may never get a lead from them. What about this letter? Hello, please confirm you've received the FS Solutions contract I sent to you. We would like to add your site into our database as an option for our candidates to receive services. Okay, that's recruiting him. But update your site profile in our database. You know, it looks like something where what he's getting is the, during the scope of the relationship, he's getting the use of this valuable database that they have, not as an owner but as a user. So certainly he is being asked to provide his information on the database, but that's a far cry from him paying for a lead. He's not being asked to pay for a lead. He's not being promised any leads. He's just being added to the provider list just as a lawyer would be added to the law firm's list of lawyers. And, you know, to the extent that clients came in with needs that matched those of the lawyer, then the lawyer would be asked to provide those services. Ms. Blank, how would you articulate the governing test here? So we start with the definition. If this is anything, right, it's going to get in as indirect advertising, not direct. So how would you articulate the test for measuring when something is indirect enough to qualify under the definition? So I think that one important aspect of the test has to be what the, I'm not sure how to pronounce it, the mouth test, M-A-U-T-H-E, is the decision of the Third Circuit. And in that decision, the court articulated there has to be essentially a three-part test, right? There has to be a good or service of the sender that is advertised by the fax. The recipient of the fax has to either be the direct buyer or someone who's in a position to influence the purchasing decision of the director. Obviously a buyer, though. What about the Third Circuit's opinion in Fishbine where the majority says a fax offering the opportunity to sell is just as commercial in character as a fax offering the recipient the opportunity to buy? And I'll address that. I think the way that they get to that is what they're really saying is the offer to buy is really an offer to sell the buying service. So if you look at the case to say we buy your old gold, we'll buy your old jewelry, we're the most reputable, we pay the highest prices, if that fax goes out, it is an offer to buy, but it is promoting the business of buying the gold. Here, that's not what has gone on. And the third part of the test, to get back to it, is there has to be a nexus. And I think that is a critical factor. There has to be some nexus between what is being advertised and the person that it's being sent to. Here, FS Solutions may describe its business. We may conclude that it inches into advertising its business. It may say it has thousands of customers and it's a national third-party administrator. But it does not intend for Dr. Thalman to be a buyer of that service. There's no nexus. But you're excluding all possibility of intermediaries, which does not seem consistent with the cases that have been decided here. No, I'm saying there has to be a nexus between the nature of the service that is being advertised and the recipient of the fax, even if the recipient. Well, that's what I'm saying. You're excluding the possibility that the recipient of the fax might be an intermediary and that they're advertising the services so that intermediary will go out and disseminate the services. No, because if the intermediary is influencing the purchasing decision of the third-party recipients, then no, I think that is included. But here, that's not what's happening. I mean, there's no one asking Dr. Thalman to go out and sell FS Solutions services to his patients. The customers here, the patients who are coming, belong to FS Solutions. All he's being asked to do is to take their urine samples or draw their blood if they show up at his office. But as I read the contract, they belong to FS Solutions for purposes of the kinds of physicals, drugs, screens, vaccinations that FS Solutions does. And in my maternity situation or somebody who suddenly needs cancer treatment who now has learned about Dr. Thalman, I read that as being outside the scope of the contract. They just know about him because they had to go because they got a new job and have some tests done. So they've learned about him. In other words, his business is being enhanced by this exposure that FS Solutions is giving him. I think that's true. But that's true of every one of the employment and independent contractor cases where the courts have said that this is not an advertisement. Wow. I mean, look at the realtor case. I think it's the Payton case where the broker, the real estate brokerage firm, sends a solicitation saying join us, join our brokerage, you know, best place to work. We pay 100% commissions. Not an advertisement. Even though clearly by joining the brokerage firm, it would enhance the realtor's business. The Uber case, similar. But that says inside the context, if you join the brokerage firm, then that's the only place you're selling, you know, real estate from. Whereas in this case, there's a possibility of expanding his non-FSS business. In that sense, lead generation. But that's not the service that they've advertised in the facts. And that's not the service they're selling to him. Well, that's the question, I think. That's the question of the reasonable way to read the facts. I think I certainly understand that's your position, but that's the question. I mean, another example that I thought of as I was trying to prepare is what about a purchase order? You know, what if I am a procurement associate for a national construction company, and I send a building supplier a letter that says we're a nationally known construction company. We're building hundreds of houses in your area, and we would like to enter into a contract with you to buy, well, let's change it. To send it to a roofer. We're building houses in your area, and we would like to enter into a contractual relationship with you to have roofs put on the houses we're building. Is that an advertisement? I don't think anyone would say so. Because it is not advertising a service that is being offered to the roofer. It's offering to buy the service for the roofer, and maybe the roofer will get other work as a result of it if the neighbor sees that the roofer's truck is in the driveway. But that's not an advertisement. It doesn't advertise the quality or commercial availability of the construction contractor's services. It just asks to buy roofing services. And, like FS Solutions in this case, the contractor's going to package that service with all of the other services provided by the subcontractors and sell that to its clients. Is there anything to be made at all in your view of this Exhibit B, the fee schedule? I think one thing that is important to note from that is that this was part of a negotiation, right? I mean, what the facts said is, tell us if you don't provide these services, and tell us if you won't accept that amount of money. So I don't think it was a universal list of services that could be required at some point, but I don't think it translates to this is a list of the services necessarily provided and that would necessarily be expected for him to provide. No, right, but if Dr. Thalman did provide them, right, he knows what he's going to receive, right, for providing them. And if you view the initial communication as inviting him into this network because of the prospect of adding to his business, it seems to me that, just looking at it objectively from a reasonable recipient standpoint, that Exhibit B is important because it would allow him to assess the profitability of the relationship, and therefore it is promoting financially membership in the network, if you will. So I think it promotes it only in the same way that the brokerage firm or law firm examples that we talked about, because if the brokerage firm says, we pay 100% commissions, you know, we pay top of the market, we pay, you know, or to the lawyer, you know, for every billable hour you record, we'll pay you $100, you know, would that change the assessment of whether or not it's an advertisement? I don't think so. I mean, you know, I think what the court's saying. So are you insisting that something has to be sold, or do you agree that an advertisement could be for purchases? So an advertisement could be for purchases, but it has to advertise a good or service of the sender, and that's an awkward match. So I think where it typically only occurs is where the facts for the purchase of something is part of a facts that advertises the business of purchasing that. That goes back to the gold or jewelry. In the business of FSS, they're buying services from Dr. Thalman and obviously many others around the country. Just like, you know, somebody who melts down gold jewelry, you know, is buying jewelry to use in their business. It's an input that they're getting. And I think that's where you go back to the requirement of the nexus that the Third Circuit talked about, and that is that what is being advertised in the facts, that is we are a national third-party administrator, is not what's being offered whether as a service for sale or a service for purchase to Dr. Thalman. That's what's being offered to FSSolutions customers. Dr. Thalman is just a provider that's part of that. I thank you for your time. All right. Thank you very much. Mr. Edelman? I think that what we ask the court to do is look at these facts and compare it to the statutory definition. FSSolutions is advertising the quality of its services and, to some extent, property. The variations are infinite. There are numerous decisions which we've cited involving things like patient-matching services and various schemes for bringing providers and recipients of services together. Some of these decisions are correct. Some of these are not. I think some of those that expanded upon LUTs are not correctly decided. They're all district court decisions. This particular facts describes certainly the quality of FSSolutions services. We don't just have a single patient is going to go into a medical office with a seven-page contract. Mr. Edelman, can I ask you a question to get the benefit? You do a lot of this litigation. You know this space pretty well. Are these cases that are right at the margins that are really hard, are they all resolved at 12B6? Most are not. Yeah. And if it went into discovery, what are the relevant inquiries in discovery when you're trying to figure out, is this facts, does it meet the statutory definition, or does it not? In some cases, it will meet it on its face. In other cases, sometimes described as pretext cases, it's necessary to determine what happens. For example, you get a facts advertising a free seminar. Yeah, we had one of those a couple weeks ago. Yeah, and what happens when you go to the seminar? Well, they sell you the defendant's product. That's an advertisement, or it's a scheme to advertise. Here, I think on the face of it, the facts advertises an opportunity involving services and property, but it might be helpful to know what happens when you sign up. Why is that at all relevant to the inquiry about whether this meets the statutory definition? Why shouldn't we be confined to the four corners of the facts itself? I think the appropriate test is, does the facts advertise or make known the quality or availability of services? And if not, what happens afterwards? Is, in fact, something sold to the recipient? It doesn't meet the definition on its face and the case is over. I disagree, Your Honor. I think the cases have a two-part test. One possibility is the facts on its face makes known the quality of services, but what if it is a free seminar? That doesn't make sense as a methodological point given what we're dealing with here, which is a junk facts statute. To my point earlier, it doesn't really matter whether there was a meaningful offer behind the facts. What matters is whether the facts itself on its face fits within the statutory definition, not what's going on in the background. I disagree with that. I think you can become within the statute based on what the facts says. However, a facts which is innocuous on its face may, in fact, be part of an effort to sell. For example, the free seminar. And why does that position make sense as a matter of statutory interpretation? Because it is part of the advertising of availability or quality of property, goods, and services. It's done in steps and there's a bit of an evasion there to possibly avoid coming within the statute, but there are lots of cases involving the so-called free seminar. And the question in those cases is what happens at the seminar? If it's to get people to listen to a sales pitch, that's advertising. Thank you very much. The case is taken under advisement. Our thanks to both counsel.